Proceed to the oral argument on the next case on the calendar, which is Reveal Chat Holdco v. Facebook. And I realize it should be meta, but you know, you may proceed. Good morning, Your Honor. May it please the Court, my name is Brian Dunn. I represent the plaintiffs' appellants in this case, and I'm going to endeavor to reserve three minutes for rebuttal. Now, there are two principal issues, if you will. Well, there are actually a whole host of issues raised in this appeal. But there are two principal findings and orders below which we're appealing here. And the first happened in 2020 when the district court dismissed with prejudice our request for an injunction to stop an ongoing and recently announced product integration. And the second was the district court's ruling after she gave leave to amend on certain claims to dismiss a number of Section 2 monopolization claims as time-barred, even though we had, in our view, adequately and plausibly pleaded fraudulent concealment. Now, I'm going to take these one by one, but again, there's a lot of briefing on this, so if the court has any questions, I'm prepared to handle whether it's the timeless issues, standing issues, or the alternate bases of appeal. So, at any point, feel free to jump in. You know, I guess I'm interested in the statute of limitations and that it would seem to me that your class, they're fairly sophisticated about the tech world. And when they were dealing with Facebook initially, you know, I always try to figure out what's the case really about and what antitrust violation would you be able to show? Because first, you have to get over the statute of limitations. And then you have to get over, you know, I mean, obviously, if we give you relief from that, then you have to be able to state a claim. And I'm trying to figure out what antitrust violation you can establish, and I'm trying to figure out why. I know that there were statements that were made that subsequently you say looking at those, you're trying to look at those and say, well, we had to show intent, and therefore those prove it. But there's nothing that I see about the statute of limitations that says you can wait until you have a better case to file it. So, it seems to me when Facebook took action after the, you know, and I guess it seems to me at some level this is you're asking on a duty to deal with, saying like somehow Facebook promised you that you could have this platform forever, and then they divorced you. So, I just don't, it seems like at that point your client, you know, what gave them that expectation? What did, you know, other than being, you know, sharp elbows business, what didn't they understand and why would they ever have any expectation that Facebook would never stop dealing with them? So, thank you, Judge Callahan, for your question. I'm just, that's sort of my global concern looking at it. What's the there there? That's the principal issue I think that we're probably here to establish. The court needs to understand, right? Well, what's wrong with this if the court's going to evaluate even right more the time on this issue? So, I want to be clear, right? So, again, right, we've, it's not merely a, well, what was an intent, what was in Mark Zuckerberg's head, for example, or, for example, one particular action. So, this isn't a case that began in 2015 with a product change. It's a four-year concerted course of action designed and executed by Mark Zuckerberg and high-level Facebook executives to use a 2015 product redesign to systematically destroy competition over a three-year period. And no one knew what actually went on, not just an intent inside the head of Mr. Zuckerberg, but the company's internal conduct, including its intentional profit sacrifice, its use of pre-planned API change several years before to co-opt data deals from dozens of specifically chosen developers who were chosen based on information from spyware, a novel spyware secretly deployed by Facebook to spy on consumers on their cell phones to determine who were particularly competitive. All while internally, the Facebooks were sounding the alarm, saying, we need to tell developers they're getting F-worded. And other executives from the top down were saying, well, if we tell anyone what's actually going on here, there's a high likelihood of breaking into jail. And so, the actual, the actual thing that happened, right, was that there's a four-year scheme, okay? And the scheme involved, among other things, saying, well, look, our business, which has a very strong barrier to entry from network effects, which, as Facebook correctly pointed out, right, they had won a competition in around 2010. But what happened was, with the rise of new technology, they faced a new threat. And there's two things they need to do. And this is also why we have two markets in this case. They have a social data market, which is essentially the basic, the basic fundamental underpinning of their business. And then a social advertising market, which is a sell-through market, which in 2010 or 2011, Facebook was struggling to enter because they're a business that sells ads, but they only had a desktop product. They needed to get ads. Let me interrupt you for just a second because I think it goes, and to follow up on Judge Callahan's question, the question is one of fraudulent concealment. And as I listen to you and I've read your briefs, your position seems to be that they were generically, fraudulently concealing their intent. Or do you have anything in the record that there was a fraudulent concealment specifically as to your clients' claims? So, and so, just Thomas, what I think you're saying here is, is there anything in the record that says, well, look, our clients wouldn't be unnoticed if the fact's giving rise to their particular claims. And that's one of the reasons that we do cite cases from this court, CONMAR, E.W. French, where the general knowledge that things are going on or have happened to you is not sufficient to put you on notice that something happened to you that was an anti-competitive act. I agree with you. The flip side of that is that the fraudulent concealment probably has to be specific as to your clients rather than generically as to the industry. Well, Your Honor, so, for example, that's actually not what the court's case law holds. I mean, CONMAR, for example, gives two examples where they say each of them could be active fraudulent concealment, one of which was filing fraudulent customs forms, which there's no allegation that the plaintiff there had ever seen those forms. But what they did was by lying to the government on customs forms, the plaintiff there wasn't able to discover the conspiracy in that case. So let me cut to the chase here. I gather your argument is that you are entitled to rely on generic fraudulent concealment as to – and you're not claiming, at least at this stage, that you can show a specific fraudulent concealment intent as to your client. Your position is that it doesn't matter, if I'm summarizing. So, okay, so there's a couple of things to disaggregate on the generic, right? Because, right, so generic is often used in terms of, for example, 10-K statements, right? Statements to the SEC, right, that someone could potentially look at and say, well, I wasn't on notice based on someone's SEC filings of what they were doing. That's generic. We do argue a lot of targeted content. It's just it's not targeted saying, hey, reveal chain. What it says is that, look, they're targeting, right, particular types of developers. And, again, it's not a massive – it's a large but very, very non-generic group. So when, for example, there's a post by Facebook on the developer's blog or the FAQ, that's specifically intended to go out to people who develop for the platform. And all three of our clients, right, were people that developed for the platform. And, indeed, that's where they found out information about what was going to change and for what reason. And so when we put in our pleading, for example, right, to the extent we possibly could, right, Simon Cross said this on this particular message board on this date, right, and reveal chat saw it. What we're saying is that, look, Facebook is targeting, right, this fraudulent concealment statements specifically towards our clients. It's not generic like the SEC, and that's not how I read the case law that says generic statement, you need reliance on it. It's something that, look, right, and we see this all the time, right. I think I take your point, and your time is running down, so I want to get to another one, which is, as I understand, if I understand your argument correctly, the fraudulent concealment was not of the fact of the change, but the intent behind the change. And my question is, if that's so, why does it matter? It's still right. So it's not simply of the fact. So there is a fact of the change. But this is why I said a little bit earlier that, look, it's actually a course of conduct that culminates in the fact of the change. And the product change that harmed our clients was, in fact, used as a manner over a course of years to perform other anti-competitive acts that harmed competition in this market. And the point is that, look, right, when you're saying, well, is this refusal to deal, if you will, competitive or anti-competitive, and we argued this below, and we've argued it here, is that, look, right, this is actually a course of conduct that culminates in a refusal to deal that is anti-competitive because, A, it lacks legitimate business justification, but also because it's part of this course of conduct, which is, right, it's more than just an intent, right? I can have an evil intent, and that's not enough. But your clients benefited from this relationship for a period of time and made some good money, then Facebook cut you off because they decided they had what they needed. What did they lie to you about when they came, other than that this would go on forever?  Because WhatsApp and Instagram were out there, and they were able to do what you say you couldn't do without Facebook, and then they got bought up by Facebook. So, you know, maybe you couldn't do what Instagram or WhatsApp could do, but I just, I'm trying to, you know, what did they conceal from you when you, you know, you knew you had some vulnerability, and that's why you were dealing with someone that you needed them, you needed them, you got something from that, and what did they, what did they take from you that they lied about? So, to be clear, right, they didn't make a decision in 2014 to make a product change. They made a decision in 2011 that in 2015 they were going to take away this source of data from developers, and they used that over the next three years to do a bunch of deals, and among other things, right. But how couldn't you know that that risk was there? What promises did they make to you that this was going to be forever? I just don't, I mean, it's, you know, I'm just trying to figure out how could you not, how could your clients not think that could happen? Well, respectfully, that's the... They could have protected themselves from not, you know, not making a contract with the devil, if they're going to call the devil later, but they wanted certain things that Facebook was going to do, right? So, to be clear, right, even in Aspen skiing, I mean, you could say, well, why are you having a joint lift ticket with the devil? I mean, they could stop it at any time, but the court said no. You can't stop it for these particular reasons where you have monopolies, and that's the issue here, right? I mean, I disagree that, look, it's them saying, well, we're going to do this forever, or even that, by the way, right, they didn't, they were required to just not do anything. But Instagram and WhatsApp were able to do what you say you couldn't do without Facebook. They did it, and then they sold it, right? That's contrary to the allegations in the FAC. In fact, in the FAC, we specifically allege that both of those companies were not monetizing at the time, and, in fact, that WhatsApp was making no money, and Facebook bought them for about 50 times their, what was deemed as their market value. So this stuff is not just not in there, it's contrary to the allegations, which are sourced from very specific things. In fact, these were bought for very inflated prices because they could potentially, according to Facebook, right, come in and then, right, be competitive with them in the social data market. And our questions are taking you to the end of your time, but we will give you some time for rebuttal. Okay, thank you. We'll hear from Meta. Thank you, Your Honor. Aaron Penner for Meta Platforms. As Mr. Dunstead, at the outset of his argument, there are two issues here. One, the dismissal of the acquisition-related claims for latches grounds, and the second, the statute of limitations ruling with respect to the remaining Section 2 claim. I perceive that the court may be focused on the latter, and I'm happy to address that. With respect to the withdrawal of the API claims, the district court correctly held that the plaintiffs were immediately on notice of both the conduct that they claim now was unlawful and their resulting injury, and nothing more is required for them to be on notice of their claim. With regard to any potential fraudulent concealment, I think the district court correctly ruled that the issue of fraudulent concealment does not arise because of the notice of the claim, but the court also correctly held that they had not pleaded, after multiple opportunities to do so, any affirmative acts of concealment. Well, when you say multiple opportunities, didn't they just do one leap to amend? That's right. That's correct, Your Honor. That multiple? Two. The multiple is two, so that's fair. Okay, well, I don't like hyperbole. They haven't asked for a leap to amend here, have they? They did not, Your Honor. So it seems undisputed that the plaintiffs knew of their injuries in 2015, but isn't that distinguishable from them knowing about their claims? So how would they have known of MEDA's alleged anti-competitive intent before the 2019 document leak? Well, Your Honor, the intent is not an element of the claim, but I think to back up, I think the district court actually articulated quite well the standard from HEXEL, which is knowledge of the facts giving rise to the claim, and the facts giving rise to the claim here were the withdrawal of the API access, as alleged, the effect that that had on these plaintiffs and the effect on competition, as well as the market circumstances that were present at the time. Again, these were all facts of which the plaintiffs were aware, and that gave them the basis for pleading their claim at the time. I would call the court's attention, and there are many factors like this in both the pleadings and in the briefing, but for example, on ER 555, in paragraph 167 of the original complaint, which is the one that's at issue in the original complaint, I believe it's also in the amended complaint, and it says that the decision to withdraw API access had only one plausible purpose, to strengthen the so-called social data barrier to entry and to ensure that competitors could not create rival social networks that could compete with Facebook. If you look as well at the briefing with regard to the refusal to deal claim, many of the facts that the plaintiffs rely on to suggest that they can satisfy the elements of a refusal to deal claim are facts of which they had awareness at the time, with reasonable diligence, including statements by Facebook to investors, including the existence of data access agreements that were reported or that would have been discoverable by simply using the absent question. So why don't you give me an example of what would establish an antitrust violation? Just to be clear, Your Honor, so that I understand the question, if you're asking what would be sufficient to plead an unlawful refusal to deal, because I don't think that they can plead an unlawful refusal to deal at all here, and we've argued that as an alternative grounds for affirmance, because they cannot plead the termination of a profitable course of dealing under circumstances that suggest irrational sacrifice of profits that are only for the purpose of recouping later. And that failure, they cannot plead that, and so I certainly don't think that there are any facts of which they're aware. Well, give me a hypothetical pleading that would state an antitrust violation under fraudulent concealment or refusal to deal. Well, I think it's very hard to imagine a circumstance in which a refusal to deal claim could be fraudulently concealed. And I've actually thought about that precise question, Your Honor, and it's hard to imagine. And the reason why is that if you think about what a refusal to deal claim looks like, as, you know, I think the one that this court pointed to in Qualcomm, and the one that the Supreme Court has said is at or near the boundary is, of course, Aspen skiing. And the circumstances there were that, of course, they were in a joint selling arrangement, and the termination of it was incomprehensible to the Aspen Highlands ski area, because it was a profitable arrangement that both were benefiting from, and it appeared that they were terminating it simply to inflict this harm on Aspen Highlands. And so they brought suit for that reason. Now, of course, they didn't know necessarily what Aspen skiing would say were the reasons that they had terminated that arrangement, and that came out. And Aspen Highlands, excuse me, Aspen skiing did offer certain reasons that the jury rejected. But the point is that in a circumstance that would give rise to such a claim, the plaintiff is it's hard to conceive of a circumstance where it would be fraudulently concealed. And it's not an accident that the cases that plaintiffs rely on here, E.W. French and Conmar involve conspiracies. So there are circumstances where the plaintiff isn't actually directly experiencing the conducted issue. What they experience is market effects that they have to try to figure out why are those market effects happening? Well, what is the market here? What is the market here? I'm not sure what it is. Well, Your Honor, we have to take as the market is pleaded. This was something that the district court said was pleaded sufficiently to allow it to go forward. There were two markets that were pleaded. One was called a social data market. The other was a social advertising market. I think this court's briefing order highlighted why social advertising market really is not meaningfully at issue in this case. With regard to the so-called social data market, this was a particular kind of data that these plaintiffs say they wanted access to for purposes of their business. Well, I'm wondering how those two markets, how they're defined and what their relationship is to each other. Well, Your Honor, I don't think this was the basis for the district court's opinion. But my understanding is that the plaintiff's theory is approximately that social data is a particular kind of data that's developed through the interaction of users of certain kinds of platforms and that that data is useful for purposes, including selling advertising. And that social advertising is a particular species of advertising that is targeted to certain users of those platforms. That's how I understand the complaints allegations. And as I say, those market definitions were accepted by the district court on the motion as being adequately pleaded for purposes of the motion to dismiss. So that was that was not the basis for the district court's ruling, either the dismissal without prejudice or the final dismissal. So I gather part of the argument on the statute of limitations is that, yes, we knew these things were happening, but we didn't understand that this was a monopoly attempt until later. In other words, there wasn't sufficient information in the public realm or to them for them to understand that there was a monopoly claim. I think that's if I'm selling their argument a bit. That's it. How do you respond to that? Sure. I think that for the first way I would respond is by precedent. I think that's very similar to the argument that was rejected and go computer there and which a case that this court case that this court cited approvingly in Excel that they knew that they knew the facts and the remaining. They knew the facts of our of META's alleged conduct, its effect on them and the supposed injury. They knew all of the circumstances, the market circumstances. And again, if you look at the way that they attempt to justify the existence of the other factors under Aspen skiing, the kinds of facts that they're talking about and that they pleaded in their own complaint are facts that were knowable at the time. So the private motivations and discussions of a defendant are never going to be knowable. And so if you and that's why this court has said that, you know, the knowledge of that kind of intent is not what's what's relevant and assurances about about that are not sufficient to constitute any sort of fraudulent concealment. But again, I think that what is sufficient for purposes of this case is the fact that the conduct and the injury and the market circumstances were all knowable to these plaintiffs. And again, if you look at what they've pleaded and argued, they say that Facebook had told the you know, had told the market that these were advantageous arrangements. And then they cut them off in circumstances that seemed, you know, on unjustifiable. If that, you know, again, we don't think they've properly pleaded that we don't think that's accurate. But those are all those assertions were all knowable at the time. And for that reason, the court quite rightly said that the pleadings supported the application of statute of limitations in this case. So what facts do you think would put them on notice that this was, I mean, an attempt at monopolization? I mean, just the refusal to deal. I mean, you basically basically your argument is that wrongful refusal to deal appeared wrong to them at the time should have been sufficient to put them on notice of monopoly claims. Yes, Your Honor. The allegation now is that the termination of that course of dealing was exclusionary conduct supporting a monopolization claim. They don't claim that they weren't aware of the market circumstances that would satisfy the market definition and market power elements of Section 2 claim. They only allege again, their only allegation with regard to what they didn't know is that they were under the supposedly mistaken impression that the changes were for purposes of user privacy protection. Now, again, there are always going to be disputes about justification in a circumstance where a plaintiff can plead a prima facie case of refusal to deal. And in this circumstance, the key point is that to be able to get to even begin to state a claim, they have to be able to plead the termination of a profitable course of dealing under circumstances that suggests that it was for purposes of monopoly recoupment. All of the facts that support that all the facts that would support such a pleading were available to them at the time, and they cite facts that were available to them at the time in arguing to this court that they've adequately adequately pleaded such a claim. Okay. You have about a minute and a half left. Anything else you want to tell us this morning? I'd be happy to address any questions that the court has for the questions. Okay. Thank you, counsel. Thank you, Your Honor. Why don't you put three minutes on? Thank you. You are muted. Thank you, Your Honor. I'll be brief because I think Mr. Panner made a lot of my points for me, and let me explain why. He just said, look, it's impossible or very, very difficult to prove that a refusal to deal is anti-competitive, and it requires specific facts, not just intent, right? And that's exactly the distinction between what happened. So, look, what we're talking about here is about what was concealed from the plaintiffs in this case, and what they knew in 2015 is not bad intent, nor is it little evidentiary details that might help round out the case. We're talking about basic, fundamental, factual distinction between, oh, Facebook changed its APIs, and now I can't use them anymore, which isn't an antitrust violation, and Mark Zuckerberg and his top executives spent four years using a pre-planned denial of access to me and a wide swathe of other businesses like me to cut deals with targeted competitors in order to dominate competition in two markets for the next decade, which is very much unlawful under the antitrust laws of the United States, and that's what we plead with specificity. Again, we plead, among other things, internal discussions by high-level people at Facebook saying, look, here's what we're doing, here's what we're changing. But why can't you prove that by circumstantial evidence? Why did you need those statements? I mean, it's saying, like, you can't prosecute someone for murder unless you have a confession. That's not true. I mean, why can't you file it in a timely way and use circumstantial evidence? Well, well, Your Honor, so, Judge Kennelhan, because refusals to deal are presumptively lawful, right, it's not, I mean, it's, right, look, it's not that there's a dead body there, right? If anything, right, like, if anything, and by the way, right, what I'm hearing from Facebook is that what they want you to do is every time that someone redesigns their product so that your business is harmed, you need to sue them in federal court for an antitrust violation. I don't think that's right, because that doesn't make any sense. That's not what Aspen is about. I mean, Your Honor is very familiar with Qualcomm. You need very, very specific facts, right, not just intent things. And so, look, when our clients found out in 2019 that engineers at Facebook were saying, among other things, right, like, well, they say it's because of privacy justifications. False. Pablum. Right? And those are the specific things that were being told to people in the market. I mean, the same things that Mr. Panner says everyone should know about, that's actually a very big distinction. And, you know, and frankly, in our view, it's the definitive distinction between, oh, no, they did something to me that harmed my business. You know, maybe, maybe it's a tort. I don't know. And, oh, wow, there's an antitrust violation. I can sue them in federal court. And so, you know, if anything, right, I think that the fraudulent concealment argument they're setting forth here is directly contrary to what they're saying on demerits. And I'm out of time. Thank you, counsel. Thank you both for your arguments this morning. The case has already been submitted for decision. And we'll proceed with the last case on the oral argument calendar.
judges: Siler, THOMAS, CALLAHAN